# EDWARD P. JENKS
Attorney at Law
332 Willis Avenue
Mineola, NY 11501
Tel: (516) 741-2920
Fax: (516) 747-3136
_____

August 20, 2012

**VIA ELECTRONIC CASE FILING**
Hon. Joseph F. Bianco
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, NY 11722

**Re: United States v. Ishmel Cohen, Docket No. 10-CR-974 (JFB)**

Your Honor:

     I respectfully write on behalf of the defendant, Ishmel Cohen, to set forth his position with respect to sentencing and to respond to the Government's recommendation of a high-end Guideline sentence of 105 months. As set forth below, defendant submits that the Government's recommendation is based on a combination of erroneous assumptions and guilt by association and that, if anything, the crack cocaine guidelines that inform his advisory sentencing range remain excessively harsh. Accordingly, defendant submits that this Court should impose the mandatory minimum sentence of 60 months or, at most, the 72-month sentence recommended by the Probation Department.

     At this late date, there can be no doubt that the Sentencing Guidelines are no longer mandatory. See United States v. Booker, 543 U.S. 220 (2005). Instead, pursuant to Kimbrough v. United States, 128 S. Ct. 558 (2007) and Gall v. United States, 128 S. Ct. 586 (2007), the Guidelines are merely a starting point.

     While Federal sentencing judges must properly calculate the applicable Guideline offense level and give it "respectful consideration," they have discretion to determine that "in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." Kimbrough, 128 S. Ct. at 564, 570. Indeed, a sentencing court is required to balance not only the Guidelines but all the factors set forth in 18 U.S.C. § 3553(a), and its overall obligation is to craft a sentence that is "sufficient *but not greater than necessary*" to accomplish these objectives. See 18 U.S.C. § 3553(a) (emphasis added); see also Gall, 128 S. Ct. at 596 n.6

1

(characterizing Section 3553(a)'s parsimony clause as a "general directive"); United States v. Sanchez, 517 F.3d 651, 660-61 (2d Cir. 2008). As such, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not... impose the higher." United States v. Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006).

In determining the proper sentence, this Court "*may not presume* that the Guidelines range is reasonable." Rita v. United States, 127 S. Ct. 2456, 2465 (2007) (emphasis added); see also Spears v. United States, 129 S. Ct. 890, 892 (2009). The sentencing court "must make an individualized assessment based on the facts presented," Gall, 128 S. Ct. at 597, and should address non-frivolous arguments put forward by the parties in support of a non-Guideline sentence. See Rita, 127 S. Ct. at 2469; see also United States v. Villafuerte, 502 F.3d 204, 210-11 (2d Cir. 2007).

The ultimate teaching of Kimbrough, Gall and their progeny is that sentencing is not a mechanical process in which the district court simply calculates a penalty for a crime. Instead, the district court must sentence a human being who has *committed* a crime, and the sentence must comport not only with the nature and seriousness of the offense but with the individual circumstances of the person who stands before the court.

In light of these teachings, the Government's recommendation is plainly flawed. First, contrary to the Government's contention, defendant did not receive a "significant windfall" as a result of the passage of the Fair Sentencing Act. See Gov't Mem. at 5. In fact, far from being an undeserved "windfall" to defendants, the Fair Sentencing Act was a long-overdue *corrective* measure to ameliorate the 100:1 crack-powder disparity, which both the Federal judiciary and Congress itself had recognized as unfair, inequitable and even institutionally racist. See United States v. Dorsey, 132 S. Ct. 2321, 2328-29 (2012). As the Dorsey Court noted:

> During the… two decades [that the 100:1 ratio was in effect], the Commission and others in the law enforcement community strongly criticized Congress' decision to set the crack-to-powder mandatory minimum ratio at 100–to–1. The Commission issued four separate reports telling Congress that the ratio was too high and unjustified because, for example, research showed the relative harm between crack and powder cocaine less severe than 100–to–1, because sentences embodying that ratio could not achieve the Sentencing Reform Act's "uniformity" goal of treating like offenders alike, because they could not achieve the "proportionality" goal of treating different offenders (e.g., major drug traffickers and low-level dealers) differently, and because the public had come to understand sentences embodying the 100–to–1 ratio as reflecting unjustified race-based differences.

Id. at 2328.

It is thus incorrect, and indeed grotesque, for the Government to describe the FSA as a "windfall." If the pre-existing penalties were unfair and excessive – which Congress has

recognized them to be – then the substitution of a new, fairer penalty is not an undeserved "windfall" or "break;" instead, it is only just. Indeed, the fact that the law setting forth the new penalty was called the "*Fair* Sentencing Act" shows that its intent and effect was not to provide a windfall but to ensure that defendants did not receive sentences greater than necessary to meet the goals of Section 3553(a).

Indeed, if anything, the FSA did not go far enough. Rather than treating crack and powder cocaine equally as recommended by the House, the ultimate, compromise bill resulted in an 18:1 disparity. This disparity resulted from a political compromise, not from any reasoned assessment of the relative harms caused by crack and powder cocaine or the relative culpability of crack and powder offenders. Hence, the logic of Kimbrough and Spears, under which this Court may reject the crack cocaine guideline because it does not represent a fair and reasonable method of calculating appropriate punishment, remains compelling.

This is particularly true since the Government itself, through the Department of Justice, has argued for a 1:1 ratio, stating that "[t]he Administration believes Congress's goal should be to completely eliminate the sentencing disparity between crack cocaine and powder cocaine." Statement of Lanny A. Breuer, Ass't Attorney General, Criminal Division, U.S. Dep't of Justice, Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity, at 10 (Apr. 29, 2009).[1] It should be noted that Mr. Breuer is an appointee of the current administration. Moreover, the Sentencing Commission has also recommended a 1:1 ratio, reasoning that any disparities in the harm caused by crack and powder cocaine may be resolved, on a case-by-case basis, through the use of sentencing enhancements. See 60 Fed. Reg. 25077 (1995).

A number of Federal judges have, as a matter of policy, adopted a 1:1 ratio for crack cocaine sentencing. See United States v. Whigham, 754 F.Supp.2d 239, 246 (D.Mass.2010) ("I will apply a 1:1 ratio for all crack cocaine sentencings"); United States v. Gully, 619 F. Supp. 2d 633 (N.D. Iowa 2009) (applying 1:1 ratio); Henderson v. United States, 660 F. Supp. 2d 751 (E.D. La. 2009) (same); United States v. Williams, 788 F. Supp. 2d 847 (N.D. Iowa 2011) (same); United States v. Peterson, 2012 WL 1195942, *1 (D.S.D. 2012) (noting, in the context of a post-conviction motion, that at the original sentencing, "[t]he court applied the 1:1 ratio to account for the disparity between powder and crack cocaine and gave Peterson a downward departure"); see also United States v. Bannister, 786 F. Supp. 2d 617, 663 (E.D.N.Y. 2011) (citing Whigham).

Defendant submits that this Court should likewise adopt a 1:1 ratio, which would result in a total offense level of 13 (based on 58 grams of powder cocaine) and an advisory range of 30 to 37 months. Alternatively, a 5:1 ratio would result in an offense level of 20 and an advisory range of 46 to 57 months. Both these ranges are below the statutory minimum of 60 months and hence counsel in favor of a minimum sentence in this case.

This Court should also reject the Government's argument for a harsher sentence on the ground of guilt by association: namely, defendant's membership in the Bloods gang. At the

---

[1] Available at http://www.judiciary.senate.gov/pdf/09-04-29BreuerTestimony.pdf (visited August 17, 2012).

3

outset, it should be noted that Mr. Cohen is a *former* Blood: since 2008, he has been a participant and facilitator in the Help End Violence Now program which serves the purpose of dismantling gangs, and has led other gang members to participate in that program.[2]

In any event, defendant is not responsible for all the acts of the Bloods, whether before or after he left the gang. The Government contends that the Bloods are "notorious for acts of violence." See Gov't Mem. at 3. But this Court is not sentencing the Bloods as a group: it is sentencing Ishmel Cohen, who has no record of violent crimes and who is not accused of using any violence in connection with this offense. Defendant did not have a gun or other weapon on his person at the time of his arrest.[3] And annexed hereto is a letter from Mr. Cohen's close friend Patricia Dean, who has known him for eight years and attest to his kindness, good manners and nonviolence.

Moreover, defendant is not accused of being a high-level drug dealer and is not alleged to have orchestrated the overall drug operations of the Bloods; instead, the small quantities sold (52 and 6 grams), and the fact that he was making street-level hand-to-hand sales, demonstrate that he is in fact a low-level operator. Indeed, the Probation Department, using information that was obviously acquired from the Government, describes Mr. Cohen as a *member* of the Bloods but "an independent street-level dealer of cocaine base in Nassau County, New York." See PSR, ¶ 2. Thus, it would hardly be fair to attribute all the depredations of the Bloods throughout the country to this defendant when he stands before the Court for sentencing; instead, he should be sentenced as the small-time, nonviolent street-level dealer that he is.

Any adverse inference from defendant's membership in the Bloods is further mitigated by the fact that, as the PSR states, he grew up in a "crack house" with drug-using and physically abusive parents, in which he bounced around between houses, had bouts of homelessness, and was taught to sell crack by his own father. See PSR, ¶ 32. He joined the Bloods precisely to get the sense of family that he never had from his parents. Id., ¶ 36. Although defendant obviously did not make the best choice of companions, his response to life on the streets is understandable in light of his childhood.

The Government suggests that, since Mr. Cohen's 75-year-old grandmother Annie Wright contradicts his account of his upbringing, this Court should give it little weight. See Gov't Mem. at 4. Annexed hereto, however, is a letter from defendant's mother Nichelle

---

[2] The fact that the instant offense consists of two hand-to-hand sales of modest amounts of crack cocaine serves to corroborate that Mr. Cohen is no longer an active Blood, let alone a "leader" of the Bloods. Gang leaders do not typically conduct street-level hand-to-hand sales themselves.

[3] The Government points to two inmate-to-inmate fights in which Mr. Cohen was allegedly involved while incarcerated in the Nassau County Jail in 2008. Neither of these fights involved a weapon, and the issue of who is the aggressor in a jailhouse altercation is typically murky. In addition, and just as importantly, defendant has not engaged in any fights during his *current* incarceration, which began in 2011, and has only been involved in a verbal dispute that resulted in a minor disciplinary ticket.

Wright,[4] who confirms that she was a drug user during his childhood, that his father was alcoholic and abusive, and that he constantly bounced around between homes. Nichelle has also informed me that Annie Wright suffers from dementia and memory loss, and that her (Annie's) account of defendant's childhood is incorrect.

It should also be noted that the probation officer, who has no doubt heard many such stories and views them with a healthy skepticism, found defendant's account credible enough to recommend a downward variance. See Recommendation at 2-3.[5] In addition, Ms. Dean's annexed letter reflects that defendant opened up to her about her difficult childhood in 2004, long before his arrest in this case and at a time when he would have had no reason to lie. Accordingly, this Court should accept defendant's account of his childhood and upbringing.

Nor is the Government correct in stating that this upbringing is irrelevant simply because Mr. Cohen is no longer a "young first offender." See Gov't Mem. at 4. The fact is that a person who has been through what defendant went through as a child cannot simply turn on a dime. Such life patterns take time to change. Nor, as yet, has defendant had the benefit of a drug rehabilitation program within a secure institutional setting, such as RDAP.[6] The defendant is not an old man; he is still 28, still associated with some of the bad companions he took up with as a result of his childhood, and as such, the difficulties of that childhood remain as a mitigating factor to be considered by this Court.

Finally, the considerations of respect for the law, just punishment and deterrence, cited to by the Government at pages 4-5 of its memorandum, weigh exactly the opposite to what the Government claims. Respect for the law will not be promoted if a low-level, nonviolent street dealer who sold approximately two ounces of crack cocaine hand-to-hand is sentenced to nine years in prison. Such a sentence would not be just punishment and would be vastly more than necessary to promote deterrence. To the contrary, such a sentence would represent a return to the bad old days in which harsh sentences were meted out to low-level crack dealers resulting in racial disparities, institutionalized injustice, and the destruction of lives and families.

Therefore, in light of all the Section 3553(a) factors, this Court should impose the statutory minimum sentence of 60 months with a recommendation for RDAP. In the alternative

---

[4] Because both defendant's mother and grandmother are named Wright, this memorandum will henceforward refer to his mother as "Nichelle" and his grandmother as "Annie." No disrespect to either woman is intended.

[5] The probation officer apparently did not interview Nichelle Wright.

[6] The Government contends that defendant is not an appropriate candidate for RDAP. See Gov't Mem. at 6. However, the decision as to whether to admit defendant to RDAP will be made by the Bureau of Prisons, not the Court. Thus, the Government's argument is moot. In any event, defendant notes that his previous opportunities for drug rehabilitation were outside the institutional setting. Unlike those programs, RDAP takes place in prison; hence, he will have the support of a structured environment, and his attendance at the programs will be enforced. Defendant submits that he should receive this chance, and that this Court should hence place on the record its *recommendation* that he be accepted to RDAP.

and at minimum, this Court should impose the 72-month sentence recommended by the Probation Department.

The Court's consideration in this matter is appreciated.

Respectfully submitted,

/s/

Edward P. Jenks

*Of Counsel:*

Jonathan I. Edelstein